[No. 60210-7.    En Banc.    October 13, 1994.]

NADINE McCLUSKEY, *Individually, as Guardian, and as Personal Representative, Respondent*, v. TIMOTHY HANDORFF-SHERMAN, *Defendant*, THE STATE OF WASHINGTON, *Petitioner.*

*Christine O. Gregoire, Attorney General, Jon P. Ferguson, Senior Counsel,* and *Michael A. Nicefaro, Jr., Assistant,* for petitioner.

*Edwards, Sieh, Wiggins & Hathaway,* by *Charles K. Wiggins; Stritmatter, Kessler & McCauley,* by *Keith Kessler; Warren, Kellogg, Barber, Dean & Fontes,* by *Mark Barber,* for respondent.

*Stewart A. Estes* on behalf of Washington Defense Trial Lawyers, amicus curiae for petitioner.

*Bryan P. Harnetiaux* and *Gary N. Bloom* on behalf of Washington State Trial Lawyers Association, amicus curiae for respondent.

MADSEN, J. — At issue in this wrongful death action is whether the trial court erred in refusing to allow the State of Washington to defend its failure to improve a section of State Route (SR) 900 by fully explaining the considerations relevant to highway improvement under RCW 47.05, Washington's priority programming law.

On the afternoon of January 13, 1989, 16-year-old Timothy Handorff-Sherman was driving his 1973 Mustang. He was accompanied by a few friends with whom he had shared several pipes of marijuana. It had been raining hard and had just started to snow. While heading eastbound on Martin Luther King Way (SR 900), Handorff-Sherman moved into the righthand lane to pass the car in front of him. As he accelerated and started to move back toward the lefthand

lane the Mustang's tires lost traction on the wet roadway. The car slid across the 5-foot sand median and struck Wallace McCluskey's car, forcing it down an embankment. McCluskey was thrown from his car and died at the scene.

On February 9, 1990, McCluskey's widow filed suit against Handorff-Sherman and the State of Washington. Nadine McCluskey alleged that the State had "maintained a hazardous and unsafe roadway" and had "failed to adequately and properly separate eastbound and westbound traffic". Clerk's Papers, at 14. At trial, McCluskey presented expert testimony that the surface of the section of SR 900 at issue was too slippery, unreasonably dangerous, and a high frequency accident area. Her witnesses testified that the State could have corrected the danger by posting "Slippery When Wet" signs, cautionary signs regarding changing lanes and speed reduction advisory signs, by resurfacing the roadway, or by installing a median barrier.

The State denied that the section of SR 900 at issue was unreasonably dangerous, unusually slippery, or that it had an unusual accident rate. The State also asserted that the remedial measures proposed were contrary to industry standards.

The State wanted to argue, in the alternative, that it could not be held liable for failing to improve SR 900 because the Legislature did not authorize funding for improving this part of SR 900 before the McCluskey accident. To support this theory, the State offered the 1986 Priority Array, the 1987-89 Highway Construction Program, and the 1987-89 Transportation Appropriation Act. The Priority Array showed the status of each section of state highway in 1986 according to criteria specified by statute; the Highway Construction Program listed the cost of each project proposed for the next 2 years; and the transportation appropriation act listed the projects funded. Exs. 177, 178, 179. None listed the section of SR 900 at issue.

The court excluded these documents and also excluded evidence that SR 900 had not been selected for funding under the 1986 Priority Array. The court did allow the State

to describe the priority-determining process in general. A state witness also explained the kinds of highway funds available to the State and the restrictions on them. The State was not allowed to argue, however, that highway improvement funds were limited and that such a limitation affected the lack of improvements to SR 900.

The State proposed lengthy jury instructions setting forth the law regarding priority programming for highway development and advising the jury that it could not find the State liable if it decided that the State acted in accordance with that law. The State also proposed an instruction on the theory of discretionary immunity, despite its earlier abandonment of that defense. The court declined to give these instructions.

Instead, the court instructed the jury that McCluskey claimed the State was negligent in maintaining an unsafe roadway, in failing to warn of the unsafe condition of the roadway, and in failing to properly separate the eastbound and westbound traffic by installing a median barrier. The court also instructed the jury that the State has a duty to exercise ordinary care in the maintenance of its public roads and that inherent in this duty "is the alternative duty either to eliminate a hazardous condition, or to adequately warn the traveling public of its presence". Clerk's Papers, at 719. The court further instructed that the jury's verdict should be for McCluskey if she proved only that "one or both of the Defendants acted, or failed to act, in one of the ways claimed by Plaintiff." Instruction 7; Clerk's Papers, at 712. The State did not take exception to any of these instructions.

The jury found the State and Handorff-Sherman each 50 percent liable, and awarded McCluskey $1,682,984.37. The verdict did not distinguish between the State's liability for failure to adequately maintain (repave or construct median barriers) versus its failure to adequately warn (sign); instead, the jury returned a general verdict of negligence against both Defendants. The trial court denied the State's motion for a new trial and entered judgment on the jury's verdict. The Court of Appeals affirmed. *McCluskey v. Handorff-Sherman*, 68 Wn. App. 96, 841 P.2d 1300 (1992). The court concluded

that the State could not use evidence of the priority process to argue immunity from, or limits on, liability due to a lack of funds allocated to highway maintenance, indicating that "[t]he State cannot avoid responsibility for its fiscal decisions by stating that those decisions have assumed the status of law and thus are unassailable". *McCluskey*, at 109.

The State sought discretionary review, arguing that it should not have been limited in explaining Washington's priority programming law and the financial restrictions it places on highway maintenance and improvement.[1] This court granted the State's motion for discretionary review.

## ANALYSIS

■■ We begin our discussion by citing the fundamental rule that an action for negligence does not lie unless the defendant owes a duty of care to the plaintiff. *Charter Title Corp. v. Crown Mortgage Corp.*, 67 Wn. App. 428, 432, 836 P.2d 846 (1992) (citing *Atherton Condominium Apartment-Owners Ass'n v. Blume Dev. Co.*, 115 Wn.2d 506, 528, 799 P.2d 250 (1990)). Under the common law, the State of Washington has a duty to exercise ordinary care in the repair and maintenance of its public highways, keeping them in such a condition that they are reasonably safe for ordinary travel by persons using them in a proper manner. *Meabon v. State*, 1 Wn. App. 824, 827, 463 P.2d 789 (1970) (citing *Provins v. Bevis*, 70 Wn.2d 131, 138, 422 P.2d 505 (1967)). This obligation includes posting warning signs when required by law or when the State has actual or constructive knowledge that the highway is inherently dangerous or of such a character as to mislead a traveler exercising reasonable care. *Bartlett v. Northern Pac. Ry.*, 74 Wn.2d 881, 882, 447 P.2d 735 (1968); *Provins*, at 138.

---

[1]The State now frames this issue in terms of the separation of powers doctrine, and alleges that the trial court and Court of Appeals decisions are an attempt by the judicial branch to interfere with legislative funding. Regardless of its relevance, this issue is being raised for the first time before this court, and hence need not be addressed. *Aripa v. Department of Social & Health Servs.*, 91 Wn.2d 135, 141, 588 P.2d 185 (1978).

Washington statutes also discuss the State's responsibilities for providing safe highways. RCW 47.01.071 provides that the State Transportation Commission is responsible for proposing legislative policies to assure the development and maintenance of a comprehensive and balanced statewide transportation system which will meet the needs of the citizens of Washington for safe and efficient transportation services. RCW 47.05, entitled Priority Programming for Highway Development, specifies how this responsibility is to be realized. The purpose of the chapter is to establish a policy for matching limited funds with the areas of greatest need, as RCW 47.05.010 makes clear:

> The legislature finds that anticipated revenues available for state highways for the foreseeable future will fall substantially short of the amount required to satisfy all of the state highway needs. It is the purpose of this chapter to establish a policy of priority programming for highway development having as its basis the rational selection of projects according to factual need, systematically scheduled to carry out defined objectives within limits of money and manpower, and fixed in advance with reasonable flexibility to meet changed conditions.

Former RCW 47.05.010.

Pursuant to this policy, the State Transportation Commission, which governs the Department of Transportation, divides the state into highway districts and divides available funds among the districts. Each district identifies projects it wants funded for a particular biennial period. The commission ranks the programs according to a formula based on factors including the structural condition of the pavement and fatal and nonfatal accidents. Former RCW 47.05.051(4). This information is compiled into a document called a Priority Array which is submitted to the Legislature for its use in authorizing and funding certain projects. *McCluskey*, at 101 n.3. The commission may depart from the priority of projects established for limited reasons only, none of which applies here. *See* former RCW 47.05.051(7).

The State argues that RCW 47.05 has, in effect, supplanted its common law duty to provide safe highways for its citizens. The State maintains that an adherence to the pri-

ority programming law and the array of projects funded thereunder absolves it of liability for the absence of improvements to a highway not included in the Priority Array.

■ When determining whether a legislative enactment can be adopted as a standard of conduct to which there is a duty to conform, Washington courts look to a 4-part test taken from the Restatement (Second) of Torts § 286 (1965). *Hansen v. Friend*, 118 Wn.2d 476, 480, 824 P.2d 483 (1992); *Young v. Caravan Corp.*, 99 Wn.2d 655, 659, 663 P.2d 834, 672 P.2d 1267 (1983). As the Restatement provides

> The court may adopt as the standard of conduct of a reasonable [person] the requirements of a legislative enactment . . . whose purpose is found to be exclusively or in part
>
> (a) to protect a class of persons which includes the one whose interest is invaded, and
>
> (b) to protect the particular interest which is invaded, and
>
> (c) to protect that interest against the kind of harm which has resulted, and
>
> (d) to protect that interest against the particular hazard from which the harm results.

Restatement (Second) of Torts § 286 (1965), *cited in Hansen*, at 481.

Examples of statutory provisions that have been held to define a standard of conduct include sections of the Washington State liquor act which prohibit the consumption and possession of liquor by minors. *See Hansen; Young.* These provisions, regulating service and sale of liquor, may be readily translated into a duty of care. In contrast, Washington's priority programming law is, as RCW 47.05.010 states, a procedure providing for the rational allocation of finite resources. While such allocation is undoubtedly intended to further highway safety, we cannot see how failing to adhere to prioritizing procedures set forth in RCW 47.05 violates a standard of care owed to highway users.

■■ We are more persuaded, however, by the State's additional contention that a full discussion of funding limitations was relevant to the discussion of whether the State was reasonable in failing to resurface or to construct a median barrier. The Court of Appeals rejected the State's

theory that lack of funds may be considered in determining whether the State has complied with its duty to use reasonable care. The court based this conclusion on the adoption of RCW 4.92.090, wherein the Legislature waived sovereign immunity in tort actions. According to the Court of Appeals, this waiver placed the State in the same position as any other defendant. *McCluskey*, at 106. However, we observe that beyond waiving the defense of immunity, nothing in this statute alters the State's common law defenses regarding highways, which are unique to the State and not shared by private parties. *See Weiss v. Fote*, 7 N.Y.2d 579, 167 N.E.2d 63 (1960) (waiver of sovereign immunity gives the State the same legal status as an individual or corporation but does not place the State on parity with a private party in respect of all of its defenses); *see also Modrell v. State*, 179 Mont. 498, 587 P.2d 405 (1978) (State's duty to maintain and design safe highways different from duty of driver to drive safe car).

Moreover, there is commentary and case law to support the State's position that funding limitations are relevant in defending the State against a claim that it was negligent when it failed to make highway improvements. *See* Richard Kuhlman, *Road Design/ Maintenance Cases: Litigating for Safety* 48-49 (Mar. 1982). Two early decisions from this court cite financial burdens as relevant in determining the reasonableness of a public authority's conduct. In one case, the plaintiff argued that her injuries were the result of Spokane County's failure to construct a sidewalk on a bridge. *Berglund v. Spokane Cy.*, 4 Wn.2d 309, 318, 103 P.2d 355 (1940). The court stated that the financial burden was one factor to consider in determining whether the County complied with its duty to use reasonable care. *Berglund*, at 319. In another case alleging a county's negligence, this court found no breach of duty for failing to maintain a bridge. *Lucas v. Phillips*, 34 Wn.2d 591, 596-97, 209 P.2d 279 (1949). In that case the bridge was too narrow for two cars to pass and the plaintiff collided with another vehicle. Although the court found this condition presented a hazard to the unfamiliar

traveler, it stated that to find negligence "would place an imponderable burden upon the various counties throughout the state which maintain many bridges of this type." *Lucas*, at 596.

The Court of Appeals recently affirmed this notion. In *Tanguma v. Yakima Cy.*, 18 Wn. App. 555, 560, 569 P.2d 1225 (1977), *review denied*, 90 Wn.2d 1001 (1978), the court found that the county had no duty to replace every highway structure which does not conform to present-day standards. Again, in *Martinez v. Grant Cy. PUD*, 70 Wn. App. 134, 139, 851 P.2d 1248, *review denied*, 122 Wn.2d 1020 (1993), the court found that "[j]ust because the PUD physically could have raised, buried, insulated or fenced off its 7,620-volt transmission lines, thus preventing this accident, does not automatically mean it had a duty to do so without regard to cost". More generally, this court stated that a city had "only the limited duty of care to act reasonably within the framework of the laws governing the municipality and the economic resources available to it". *Bailey v. Forks*, 108 Wn.2d 262, 271, 737 P.2d 1257 (1987).

While there is support for the State's position that it was entitled to present the extent of its available resources on the issue of improving SR 900 through construction of a median barrier or resurfacing, we note that the financial considerations addressed in the Priority Array statute have no relevance to the issue of signing. As this court found in *Lucas*, the potential financial burden involved in improving bridges was not a factor where the breach of duty alleged was merely the failure to place proper warning signs at the entrances to such bridges. *Lucas*, at 596-97.

■ A similar allegation of inadequate warnings in this case prevents us from concluding that any error with regard to the priority programming evidence warrants reversal. (We also note that the State never requested an instruction allowing the jury to consider the priority programming process in deciding whether the State acted reasonably with regard to McCluskey's maintenance/improvement claim.) The evidence at trial was, as the State now concedes, that

signing decisions are not part of the priority programming process or affected by financial constraints. The State made no objections to the court's instructions joining the warning and improvement claims and treating them as alternative duties, nor did it object to the verdict form. The State now admits that the warning claim was properly for the jury, and concedes that because of the general nature of the verdict it is impossible to know whether the jury found liability based on the failure to warn or the failure to resurface or construct a barrier. We cannot now dissect the jury's general verdict, nor can we disregard it.

While we could end our discussion here, we would be remiss if we did not comment on the Court of Appeals' discussion of immunity. Even though the State abandoned its claim of discretionary immunity at trial, the Court of Appeals analyzed the priority programming issue as though it were based on a claim of immunity. The Court of Appeals stated that because the State waived sovereign immunity in 1961 and because the Legislature did not include an express grant of immunity in RCW 47.05, there is no immunity for priority programming decisions. However, the Court of Appeals' published discussion of immunity was incomplete.

It is true that in 1961 the Legislature waived sovereign immunity:

> The state of Washington, whether acting in its governmental or proprietary capacity, shall be liable for damages arising out of its tortious conduct to the same extent as if it were a private person or corporation.

RCW 4.92.090 (amended 1963). This court has observed, however, that this waiver is not as broad as it could have been written. *Evangelical United Brethren Church v. State*, 67 Wn.2d 246, 252, 407 P.2d 440 (1965). Under RCW 4.92-.090, state government is rendered liable for damages only when the official conduct is tortious and analogous to the chargeable misconduct and liability of a private person or corporation. The State is not liable for every harm that may flow from governmental action. Negligent conduct must be present. *Evangelical Church*, at 253. Under *Evangelical*

*Church*, therefore, a narrow category of discretionary governmental immunity exists as a court-created exception to the general rule of governmental tort liability. *Bender v. Seattle*, 99 Wn.2d 582, 588, 664 P.2d 492 (1983). Its applicability is limited to high-level discretionary acts exercised at a truly executive level. *Bender*, at 588.

Thus, it is necessary to determine where, in the area of governmental processes, orthodox tort liability stops and the protected act of governing begins. *Evangelical Church*, at 253. This court has set out four questions to help determine whether an act is a discretionary governmental process and therefore nontortious:

> (1) Does the challenged act, omission, or decision necessarily involve a basic governmental policy, program, or objective? (2) Is the questioned act, omission, or decision essential to the realization or accomplishment of that policy . . . as opposed to one which would not change the course or direction of the policy, program, or objective? (3) Does the act . . . require the exercise of basic policy evaluation, judgment, and expertise on the part of the governmental agency involved? (4) Does the governmental agency involved possess the requisite . . . authority . . .?

*King v. Seattle*, 84 Wn.2d 239, 245, 525 P.2d 228 (1974); *Evangelical Church*, at 255. In addition, the action or decision at issue must actually have been considered and reasoned in order to be entitled to immunity. *King*, at 246.

We note that the State Highway Commission, which is responsible for assembling the Priority Array and the proposed highway improvement budget, is the governing body of the Department of Transportation, and sets policy for the Department. *Legislative Report*, 45th Legislature, 1st Ex. Sess., at 179 (Final ed. 1977); RCW 47.01.071(2). There is no discussion by the Court of Appeals, however, of the *Evangelical Church* questions and whether assembly of the Priority Array represents a high-level discretionary decision.

Moreover, the Court of Appeals did not discuss case law from Washington and other jurisdictions of potential relevance to the argument that the State's failure to include SR 900 in its 1986 Priority Array and thus to allocate funds

for its improvement may be protected by immunity afforded the decision-making process. *See, e.g., Jenson v. Scribner*, 57 Wn. App. 478, 789 P.2d 306 (1990) (parties concede that the State's decision concerning the installation of a barrier is subject to discretionary immunity); *Julius Rothschild & Co. v. State*, 66 Haw. 76, 655 P.2d 877 (1982) (the State's failure to repair or replace a bridge is covered by immunity); *Industrial Indem. Co. v. State*, 669 P.2d 561 (Alaska 1983) (the State's failure to install highway guardrail is protected by immunity). Other cases and commentary discuss how budgetary decisions may be potential candidates for discretionary immunity. *See Wainscott v. State*, 642 P.2d 1355 (Alaska 1982); *State ex rel. Adkins v. Sims*, 130 W. Va. 645, 46 S.E.2d 81 (1947); *see also 4 Selected Studies in Highway Law, Liability of State Highway Departments for Design, Construction, and Maintenance Defects* 1834-S48 (Ross D. Netherton ed., 1991) ("[T]he courts have uniformly recognized that decisions made in respect to the allocation of limited financial resources are part of the planning process and hence immune under the discretionary exemption.").

While we can draw no conclusions about discretionary immunity in this case because of the State's abandonment of the theory at trial, the above discussion outlines the analysis. Resolution of the immunity question in highway improvement decisions must await a case in which the issue has been preserved for review.

Accordingly, we affirm on different grounds the decision of the Court of Appeals and the judgment of the trial court and uphold the jury's verdict against the State of Washington in this case.

DOLLIVER, DURHAM, SMITH, and GUY, JJ., concur.

ANDERSEN, C.J., concurs in the result.

BRACHTENBACH, J. (concurring in part, dissenting in part) — I concur in the result reached by the majority, but disagree with its speculative reasoning on two theories. Much

of the opinion is dicta, ignores the record and is wrong in its analysis.

This should be a very narrow decision dictated by the record. The majority agrees that the trial court was correct in denying a new trial and the Court of Appeals properly affirmed. Specifically, the majority holds:

> The evidence at trial was, as the State now concedes, that signing decisions are not part of the priority programming process or affected by financial constraints. The State made no objections to the court's instructions joining the warning and improvement claims and treating them as alternative duties, nor did it object to the verdict form. The State now admits that the warning claim was properly for the jury, and concedes that because of the general nature of the verdict it is impossible to know whether the jury found liability based on the failure to warn or the failure to resurface or construct a barrier. We cannot now dissect the jury's general verdict, nor can we disregard it.

Majority, at 10-11.

That should end the matter; the opinion need contain little more. But the majority goes on to speculate how the State *might* have defended and what the law *might* be if the State had tried the case differently. The majority discusses discretionary immunity and funding limitations.

Consider first discretionary immunity as a complete defense to any liability. After discussing that issue, the majority concludes: "[W]e can draw no conclusions about discretionary immunity in this case because of the State's abandonment of the theory at trial". Majority, at 13. That conclusion should be the extent of the discussion about discretionary immunity, but the majority goes on, ignoring Washington authority and relying on inapposite cases from other jurisdictions.

Should there be any doubt about the fact there should be NO analysis of discretionary immunity, I quote the State's position at trial: "Now, *we are not claiming immunity in this case. We are not claiming immunity.* I think the planning function is a subject for immunity argument, but *we are not making it here.*" (Italics mine.) Rep.'s Tr., at 2219. The State's brief never mentions discretionary immunity.

Some comment on the majority's discussion of discretionary immunity is necessary because it unnecessarily confuses the issue with an erroneous analysis. The majority notes *Evangelical United Brethren Church v. State*, 67 Wn.2d 246, 252, 407 P.2d 440 (1965). This is a judicially created exception to the very broad statutory waiver of *all* immunity.[2] RCW 4.92.090. It is an "extremely limited exception". *Stewart v. State*, 92 Wn.2d 285, 293, 597 P.2d 101 (1979). *Stewart* specifically held that the negligent design of a bridge and its lighting system was *not* within discretionary immunity. The majority ignores *Stewart*, but it defies reason to suggest, as does the majority, that failure to resurface a curve or install a short median barrier might fall within discretionary immunity.

Not even the Department of Transportation (DOT) believes it has the immunity suggested by the majority. In 1991, at the request of DOT, Substitute Senate Bill 5721 was introduced. It would have immunized the State from liability for highway design, construction, or signing if such conformed to current engineering or design standards. However, the bill itself, in its declaration of legislative intent, stated: "However, it will not relieve government agencies, from meeting their public obligations to maintain safe roadways and facilities, nor to respond to public notice of unsafe conditions." Substitute Senate Bill 5721, 52d Legislature (1991). Further, the bill provided it did not apply to damages from a defect from deficient maintenance of which the agency had actual notice. Br. of Resp't. app. A.

The Legislature did not enact DOT's request for limited immunity. One can only conclude that the Legislature did not intend to create a special immunity for highway defects, as the majority would appear to want. It is significant that when the Legislature intends to provide immunity, it does so specifically as in qualified immunity for certain recreational uses,

---

[2]There is an unbriefed question of the relevance of the doctrine of limited discretionary immunity because governmental liability for the negligent maintenance of highways existed long before the abolishment of governmental immunity by RCW 4.92.090. *Hewitt v. Seattle*, 62 Wash. 377, 113 P. 1084 (1911).

RCW 4.24.210; certain actions regarding mental illness evaluation and treatment, RCW 71.05.120; and militia's federal activities, RCW 38.40.025. The Legislature has not granted similar immunity for actions based on negligent highway design or maintenance; indeed, it has refused to do so.

The authorities relied on by the majority do not support its suggestion that there might have been discretionary immunity if the State had not repeatedly waived that defense. First cited is *Jenson v. Scribner*, 57 Wn. App. 478, 789 P.2d 306 (1990), which is no authority at all when one reads the case. The plaintiffs in *Jenson* conceded the claimed fault was a result of a discretionary act. The parties cannot stipulate to what is the law and the case stands for nothing relevant.

The majority cites cases from other jurisdictions, but neglects to consider whether those states have the same law as we do on waiver of immunity and our extremely limited exception of discretionary immunity.

The majority cites *Julius Rothschild & Co. v. State*, 66 Haw. 76, 655 P.2d 877 (1982). It fails to recognize that discretionary immunity in Hawaii is not an extremely narrow exception, but rather there is a broad grant of immunity in a limited statutory waiver of governmental immunity. The statute excludes any tort claim based upon "the exercise or performance or the failure to exercise or perform a *discretionary function or duty* on the part of a state officer or employee". *Rothschild*, at 79. Thus, discretionary immunity is the rule rather than the exception. Further, the facts, not mentioned by the majority, clearly distinguish *Rothschild*. The claim was for property damages from a flood. Plaintiff claimed the State should have replaced an existing, completely functional 2-span concrete bridge to meet expected floods every 50 years rather than every 25 years as the bridge was designed to accommodate. Those facts are a far cry from resurfacing a curve or installing a short barrier.

Next, the majority cites *Industrial Indem. Co. v. State*, 669 P.2d 561 (Alaska 1983). Again, the nature of that state's governmental immunity makes the case of little relevance. The Alaska statute specifically exempts *all* discretionary

functions and even excuses an abuse of discretion. Unlike the facts in this case, there was nothing unusual about the particular road and the court noted that making improvements in similar highways would require "several tens of millions of dollars." *Industrial Indem.*, at 565. The dissent pointed out that the majority confused the absence of negligence with immunity. The majority here does the same.

The majority's reliance on *State ex rel. Adkins v. Sims*, 130 W. Va. 645, 46 S.E.2d 81 (1947) is plain amazing. The citation by the majority is the first and only time in 47 years that any other jurisdiction has cited the case for the point stated by the majority. The majority conveniently fails to compare the law of that state with ours. In West Virginia, by statute there is no liability for negligence in the construction and maintenance of highways. In fact, its constitution prohibits suits against the State. *See State ex rel. Vincent v. Gainer*, 151 W. Va. 1002, 158 S.E.2d 145 (1967). The only issue was whether the State had a "moral duty" to respond in damages.

It seems beyond question that discretionary immunity is not an issue and should not be discussed. I repeat the State's own statements on the record: "Now, we are not claiming immunity in this case. We are not claiming immunity." Rep.'s Tr., at 2219.

As a second major point the majority engages in a confusing and unnecessary discussion about funding limitations. So far as I can discern, the majority reaches no conclusion beyond stating:

> We are more persuaded, however, by the State's additional contention that a full discussion of funding limitations was relevant to the discussion of whether the State was reasonable in failing to resurface or to construct a median barrier.

Majority, at 8. What a "full discussion" means in the context of the admission of evidence and jury instructions is not clear.

The majority's confusion is readily apparent. It states as quoted above that a "full discussion" of funding limitations was relevant to determining whether the State was "reason-

able" in failing to act. Presumably, the majority is trying to frame the question as one of the relevance of the admission of funding limitations on the question of the State's negligence. In other words, the majority seems to consider lack of funding as a part of the feasibility of corrective action. Unfortunately for the majority, that is not at all what the State wanted. The majority simply ignores the State's requested instruction which would have provided a complete defense. Clerk's Papers, at 589-604. Granting a complete defense is quite different from the question of relevance of evidence going to feasibility.

The State argues that funding limitations should be relevant to its negligence, but cites no authority that such should be a complete defense. Br. of Appellant, at 47-48.

What the majority and the State attempt is to convert a computer generated array of priorities, used as a budgeting tool, into a legal defense against well-established tort liability. RCW 47.05 is simply a mechanism, as its title states, of "priority programming for highway development".

The State was permitted to present evidence of priority programming, including evidence about high accident rates and about this particular location. Rep.'s Tr., at 2711-13, 2854-75. However, the trial court refused to admit evidence that a lack of funding was a complete defense to liability for these specific defects. The majority does not mention the trial court's reasoning:

> No one from the Department testified that if we had more funds we would have solved this problem on State Route 900. Had that been the case, then I think the Priority Array issues would have been very relevant and considered by this jury. But that's not the position of any witness. . . .
>
> . . . .
> . . . [I]n this case no one ever identified this area as an area which needed concern. No one ever testified, as I said earlier, that if there was money, we would have fixed this problem. The position of the State has been — and very consistently — there is no problem.
>
> And alternate defenses, even though they are recognized in law and perfectly appropriate under some facts or circumstances would not be appropriate in this case as being totally outside the scope of competent evidence, relevant evidence.

Even if at all probative, let the record reflect that I find that much more prejudicial in this case than any possible probative value.

Rep.'s Tr., at 2947-48.

The problem for the State's position on funding is that this record does not permit separate consideration of that issue from liability for failure to properly and safely sign the highway. The majority admits this: "[W]e note that the financial considerations addressed in the Priority Array statute *have no relevance* to the issue of signing." (Italics mine.) Majority, at 10.

The majority continues: "We also note that the State never requested an instruction allowing the jury to consider the priority programming process in deciding whether the State acted reasonably with regard to McCluskey's maintenance/improvement claim." Majority, at 10.

The majority correctly concludes that this record: "*[P]revents* us from concluding that *any error* with regard to the priority programming evidence warrants reversal." (Italics mine.) Majority, at 10. In other words, on this record, exclusion of evidence about funding limitations was not error and the issue is not presented. Despite its own words and correct exclusion of the issue, the majority spends five pages discussing why priority programming and funding limitations *might* be relevant to determining negligence even though the State claimed it as a complete defense.

Some response is necessary to this nonissue, which does not warrant reversal according to the majority, because it errs in its analysis.

Somehow the majority goes off on a tangent as to whether the priority programming/budgeting process sets a standard of care for the State. It reaches this puzzling conclusion:

While such allocation [of funding] is undoubtedly intended to further highway safety, we cannot see how failing to adhere to prioritizing procedures set forth in RCW 47.05 violates a standard of care owed to highway users.

Majority, at 8. That statement seems entirely irrelevant. Plaintiff makes no such claim and the State contends just

the opposite, *i.e.*, that compliance with the statute is a complete defense.

The majority cites *Modrell v. State,* 179 Mont. 498, 587 P.2d 405 (1978), for the amazing proposition that a complete waiver of governmental immunity does not alter "the State's common law defenses regarding highways". Majority, at 9. The *Modrell* case says no such thing.

The majority fails to note that the *Modrell* court approved a jury instruction exactly contrary to what the majority advocates. The approved instruction read as follows:

> "If you find the defendant negligent in planning or constructing or maintaining the highway in question, you may not excuse such negligence on the ground that proper construction was beyond the financial means of the State. Cost is not a factor in the duty of the State to plan, construct and maintain its highways in a reasonable safe condition."

*Modrell,* at 501. *Accord Townsend v. State,* 227 Mont. 206, 210, 738 P.2d 1274, 1277 (1987).

In stark contrast, the State's proposed instruction here would have instructed the jury that if "planning and programming for SR 900 . . . was carried out in accordance with the provisions of Washington's priority programming law . . . you may not find the Department of Transportation liable." Br. of Appellant app. 1 (Def.'s proposed instruction 32).

The only other authority cited for the majority's proposition about defenses is *Weiss v. Fote,* 7 N.Y.2d 579, 167 N.E.2d 63 (1960), which has nothing to do with funding, but whether establishing a "clearance interval" at a traffic light was arbitrary or unreasonable.

The majority then, without reaching a conclusion, appears to abandon the notion that lack of funding is a defense and turns to a totally different concept that "funding limitations are relevant in defending the State against a claim that it was negligent when it failed to make highway improvements." Majority, at 9. Again, this new issue seems entirely irrelevant to this case because the State presented it as a *complete defense.*

The majority uses Washington cases rather carelessly. It cites *Berglund v. Spokane Cy.*, 4 Wn.2d 309, 318, 103 P.2d 355 (1940). Majority, at 9. It is interesting to note that the page of the opinion cited by the majority is largely a summary of the County's arguments that if it were liable "progress would be paralyzed". The court did not accept the argument, but rather stated:

> To sustain respondent's [County] contention, would be to hold, as a matter of law, that, regardless of the conditions existing on the bridge, regardless of the magnitude of the risk to pedestrians, and regardless of how simple and economical the construction of a sidewalk or the reservation of space for pedestrians might be, the county would nevertheless be absolved from any liability for negligence.

*Berglund*, at 318-19. Note that is exactly what the State proposed in this requested instruction.

However, the *Berglund* court continued with a more complete statement than acknowledged by the majority:

> The financial burden, technical considerations, and other factual circumstances, are all factors to be considered in determining whether or not the county complied with its duty to use reasonable care.

*Berglund*, at 319.

The majority also makes too much of an isolated, partial quote from *Lucas v. Phillips*, 34 Wn.2d 591, 209 P.2d 279 (1949). The court held that the mere maintenance of a narrow bridge was not negligence. That point alone is the reference quoted by the majority about "an imponderable burden upon the various counties throughout the state which maintain many bridges of this type." *Lucas*, at 596. In other words, there was nothing unusual about this particular bridge. Contrast the evidence here about the high accident rate at this particular location. The *Lucas* court went on to hold that financial consideration was not a factor in finding the County liable because it "was bound to use such care as would keep it in a reasonably safe condition for those who might go upon it; and this duty included the placing of proper warning signs when necessary." *Lucas*, at 597. This is

precisely one of the issues submitted to this jury in this case and the reason for affirming an unsegregated verdict.

The majority's use of *Tanguma v. Yakima Cy.*, 18 Wn. App. 555, 569 P.2d 1225 (1977), *review denied*, 90 Wn.2d 1001 (1978) is also misleading. The court, in dicta, observed that there is "no duty to replace *every* highway structure [a bridge] not conforming to present-day standards." (Italics mine.) *Tanguma*, at 560. This case does not involve replacement of every highway, but simply negligence in not correcting a particular location where the percentage of median crossover accidents was higher than comparable roadways in Western Washington and where an expert testified that this particular location was "unreasonably dangerous". Rep.'s Tr., at 574-75.

Next, the majority takes a partial quote of dicta from *Bailey v. Forks*, 108 Wn.2d 262, 737 P.2d 1257, 753 P.2d 523 (1987). The Court of Appeals in this case correctly distinguished *Bailey*. It noted that *Bailey* involved the public duty doctrine and specifically the government's duty to protect people from the conduct of third persons rather than the State's own conduct. Further, *Bailey* involved liability of a municipality which is dependent on state law to generate revenue while the State is in control of the allocation of funds. *McCluskey v. Handorff-Sherman*, 68 Wn. App. 96, 841 P.2d 1300 (1992), *review granted*, 121 Wn.2d 1021 (1993).

The whole issue is ably and correctly summarized by Judge Agid in *Savage v. State*, 72 Wn. App. 483, 495, 864 P.2d 1009 (1994):

> While we agree generally with the distinctions drawn in *McCluskey* [*v. Handorff-Sherman*, 68 Wn. App. 96, 841 P.2d 1300 (1992), *review granted*, 121 Wn.2d 1021 (1993)], neither it nor *Bailey* [*v. Forks*, 108 Wn.2d 262, 271, 737 P.2d 1257, 753 P.2d 523 (1987)] is entirely on point. We can best resolve this issue by reference to RCW 4.92.090. That statute, discussed above, provides that the State "shall be liable for damages arising out of its tortious conduct to the same extent as if it were a private person or corporation." While the availability of funding may be relevant to the reasonableness of the officers' actions, there is no authority for the State's argument that it was entitled to a specific instruction on this issue. RCW 4.92-

.090 mandates that the State is to be treated in the same manner as a private person or corporation. No authority is cited supporting the proposition that a private person or a corporation would be entitled to have the jury instructed that it could consider their particular financial circumstances in evaluating the reasonableness of their conduct. The trial court did not abuse its discretion in refusing to instruct the jury that it could consider the State's resources in judging the reasonableness of the State's conduct.

(Footnote omitted.) *Savage*, at 495.

I agree entirely with Judge Agid's analysis and conclusion.

In summary, discretionary immunity is not an issue in this case. It should not be discussed. If it were an issue, the conduct here involved does not fall within the extremely narrow exception created by discretionary immunity. The absence of funding for these minor repairs to a specific location is not a defense. Upon this record, there was no reason to admit testimony of the absence of funding nor to instruct that such was a complete defense as requested by the State.

I would limit the holding to the issues properly before the court. As noted above, the following portion of the majority opinion correctly summarizes the only ground needed to affirm in this case:

The evidence at trial was, as the State now concedes, that signing decisions are not part of the priority programming process or affected by financial constraints. The State made no objections to the court's instructions joining the warning and improvement claims and treating them as alternative duties, nor did it object to the verdict form. The State now admits that the warning claim was properly for the jury, and concedes that because of the general nature of the verdict it is impossible to know whether the jury found liability based on the failure to warn or the failure to resurface or construct a barrier. We cannot now dissect the jury's general verdict, nor can we disregard it.

Majority, at 10-11.

UTTER and JOHNSON, JJ., concur with BRACHTENBACH, J.

Reconsideration denied November 17, 1994.