# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

STATE OF WASHINGTON,           )
                               )     No. 68766-2-I
                Respondent,    )
                               )     DIVISION ONE
        v.                     )
                               )     UNPUBLISHED OPINION
D'MARCO LA'CALVIN MOBLEY,       )
                               )
                Appellant.     )     FILED: June 30, 2014
                               )

APPELWICK, J. — Mobley appeals his multiple felony convictions. He argues that he was denied effective assistance of counsel when his attorney misadvised him of the sentencing consequences of going to trial versus accepting a plea deal. He also alleges several trial errors, including a Batson[1] violation, evidentiary errors, and insufficient evidence. He argues that his kidnapping conviction should have merged into his convictions for rape in the first degree. Finally, he contends that the court erred in using his juvenile adjudications to enhance his offender score. We reverse Mobley's kidnapping conviction and remand to the trial court for resentencing. We otherwise affirm.

## FACTS

This case arises from D'Marco Mobley's pimp/prostitute relationship with three women: A.W., J.B., and J.J. Mobley and A.W. met through a mutual acquaintance. Mobley became A.W.'s pimp and the pair eventually entered into an intimate relationship. Mobley and A.W. later met another prostitute, J.B. J.B. began to work for Mobley. Eventually, J.B. also entered into an intimate relationship with Mobley. This caused jealousy and tension between A.W. and J.B. A.W. decided to leave Mobley

---

[1] Batson v. Kentucky, 476 U.S. 79, 86, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986)

J.B. continued to work for Mobley for some time, but ultimately decided to leave him as well. She sent him a text informing him of this and began working with another prostitute, J.J. J.J. had also met Mobley around the same time through her pimp, "Boom." She said that Mobley commanded her to work for him too. Although she tried to avoid Mobley, she would occasionally give him money. She was 17 years old at the time.

One month after J.B. left Mobley, she and J.J. saw him at a local hotel. J.B. agreed to speak with Mobley in his car. At first, Mobley was kind to J.B., telling her that he missed her and was worried about her. But, when J.B. told Mobley that she no longer had feelings for him or wanted to work for him, he became aggressive. He grabbed J.B. and took her keys, phone, and purse. J.J. came down to the car and eventually persuaded Mobley to calm down.

After J.B. and J.J. got out of the car, they called Bill—a man with whom J.B. had previously been involved—for help. Bill later called J.J. and told her and J.B. to come outside. Bill and three other men had Mobley at gunpoint in the parking lot. The men beat Mobley to the point of unconsciousness. J.B. took back her keys and phone, and broke Mobley's car windows.

Mobley later called J.J. and J.B. and threatened them. The next day, a rock was thrown through J.B.'s window, and J.B. and J.J. suspected that Mobley was the culprit. Mobley called J.B. the day after that, asking for a ride to his mother's house. J.B. felt bad for Mobley because Bill had beaten him up, so she agreed.

When J.B. picked Mobley up, he told her he did not feel safe with her driving and asked if they could switch places. J.B. agreed. When she got back into the car, Mobley pointed a gun at her and drove to the Riverside Casino in Tukwila. Mobley then wrapped

2

a sweater around J.B.'s face and placed her in the trunk. At some point, Mobley met up with another man and they put J.B. in the trunk of a different car. They drove around throughout the night, at various points beating J.B., shoving a gun in her face, threatening to make her swallow a bullet, and demanding oral sex.

Mobley eventually took J.B. to her house where she changed her clothes. Mobley then told her to call up customers to set up dates. She contacted a regular customer who booked her a hotel room. A detective, who had been looking for J.B. overnight, contacted her there. They arranged a sting operation that led to Mobley's arrest.

Mobley was convicted of promoting commercial sexual abuse of a minor, promoting prostitution in the first degree, promoting prostitution in the second degree, kidnapping in the first degree, robbery in the second degree, two counts of rape in the first degree, and unlawful possession of a firearm in the first degree. He appeals.

## DISCUSSION

### I. Ineffective Assistance of Counsel

Mobley argues that he was denied effective assistance of counsel when his attorney misadvised him of the sentencing consequences of going to trial. Mobley further maintains that the trial court erred in failing to hold an evidentiary hearing on the issue.

### A. Effective Assistance of Counsel

The Sixth Amendment of the United States Constitution guarantees defendants the right to effective assistance of counsel. Strickland v. Washington, 466 U.S. 668, 685, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). To demonstrate ineffective assistance, an appellant must show that the attorney's performance was deficient and that the deficiency was prejudicial. State v. Thomas, 109 Wn.2d 222, 225-26, 743 P.2d 816 (1987).

Deficient performance is that which falls below an objective standard of reasonableness. In re Det. of Moore, 167 Wn.2d 113, 122, 216 P.3d 1015 (2009). Prejudice occurs if, but for the deficient performance, there is a reasonable probability that the outcome of the proceedings would have been different. State v. McFarland, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995). There is a strong presumption of effective assistance. Moore, 167 Wn.2d at 122. But, we will conclude that counsel's representation is ineffective if we can find no legitimate strategic or tactical reason for a particular decision. McFarland, 127 Wn.2d at 336.

The right to effective assistance extends to the plea bargaining process. Padilla v. Kentucky, 559 U.S. 356, 373, 130 S. Ct. 1473, 176 L. Ed. 2d 284 (2010). To show prejudice where a plea offer has been rejected because of counsel's deficient performance, a defendant must demonstrate a reasonable probability that he would have accepted the more favorable plea offer had he received effective assistance of counsel. Missouri v. Frye, ___ U.S. ___, 132 S. Ct. 1399, 1409, 182 L. Ed. 2d 379 (2012). The defendant must further demonstrate that there is a reasonable probability that the plea would have been entered without the prosecution canceling it or the trial court refusing to accept it. Id.

Mobley's attorney raised the issue of ineffective assistance at his sentencing hearing. Counsel said:

> Mr. Mobley had mentioned to me in lesser detail in the past an issue which he would seek to raise at this time. And that is one with regard to whether or not he was fairly advised by the State in their proffer of a plea agreement as to the consequences of his failing to accept that.[2]

---

[2] The State's proposal does not purport to state the maximum that Mobley faced if convicted of all charged crimes. In that respect, it cannot constitute a misrepresentation

4

He then referenced a January 4, 2012, memo from the State that proposed a plea deal.

The memo stated that:

> Assuming that the defendant's prior juvenile record will count as 3 points for many of the current crimes above, . . . if he is convicted of 7 of the pending 9 charges . . . he will be maxed out at 9 points. . . .
>
> . . . .
>
> If the defendant is maxed out following trial and convicted of any rape or the [promoting commercial sexual abuse of a minor] charge, the State will be recommending the high end of the range (318 months) plus the 5 year weapon enhancement. That would bring his total time to 378 months, or 31.5 years.

The memo continued to propose a "low-end sentence recommendation of 210 months."

Counsel told the court he read this to mean that, if Mobley was convicted, his sentences would be served concurrently, rather than consecutively. Counsel stated that he failed to do his own research about sentencing consequences without any strategic reason for doing so. As a result, counsel averred, he incorrectly advised Mobley that his sentences would run concurrently and Mobley relied on this advice in rejecting the plea. The trial court sentenced Mobley to 240 months on one count of first degree rape, 93 months on the other, and 51 months on kidnapping in the first degree, to be served consecutively. He was sentenced to 444[3] months in total.

---

of Mobley's risk of going to trial. Instead, Mobley's focus is that his counsel should have explained that the State's offer did not represent the maximum he was facing and that counsel admittedly did not do so.

[3] Mobley's sentence appears to include a 60 month firearm enhancement on his kidnapping conviction. We note that the firearm enhancement box was not checked on page 5 of Mobley's judgment and sentence. However, page 2 indicates that a 60 month enhancement applied to his kidnapping conviction. And, Mobley does not dispute that a firearm enhancement was imposed or that the imposition was proper.

This is the extent of the relevant evidence presented on appeal: the State's memo and counsel's brief comments at the sentencing hearing. There is no proof of what else counsel communicated to Mobley; what other relevant information Mobley received, if any; or to what extent Mobley relied on counsel's advice in choosing to proceed to trial. We decline to rely solely on Mobley's allegations of deficient performance and prejudice as articulated through his trial and appellate counsel. We cannot conclude on this record that Mobley suffered from ineffective assistance of counsel.

B. Evidentiary Hearing

Mobley further asserts that the trial court wrongly declined to hold an evidentiary hearing on the issue of ineffective assistance. Whether to grant an evidentiary hearing is a matter within the trial court's discretion. See McCluskey v. Handorff-Sherman, 68 Wn. App. 96, 105, 841 P.2d 1300 (1992), aff'd, 125 Wn.2d 1, 882 P.2d 157 (1994).

When Mobley's counsel raised ineffective assistance, the State objected because Mobley had not previously raised or briefed the issue. The court chastised Mobley for his untimely oral motion and failure to provide relevant materials to the court or the State. It then acknowledged that there were "two solutions to this. We can adjourn the proceedings and the Court can weigh and consider whether or not Counsel needs to be appointed and resolve this issue at this level or it can go to the appellate courts having preserved your record." The court ultimately decided to conclude the proceedings and leave the issue for appeal.

Mobley cites Lafler v. Cooper, ___ U.S. ___, 132 S. Ct. 1376, 182 L. Ed. 2d 398 (2012), to assert that he should have been provided an evidentiary hearing. In Lafler, the defendant alleged that his counsel's inadequate assistance caused him to reject a plea

6

offer and that he received a less favorable outcome at trial. Id. at 1383. The State agreed that counsel's performance was deficient. Id. at 1384. Thus, the sole question in front of the Court was "how to apply Strickland's prejudice test where ineffective assistance results in a rejection of the plea offer and the defendant is convicted at the ensuing trial." Id. The Court noted that, in some cases, an evidentiary hearing may be appropriate:

> In some cases, the sole advantage a defendant would have received under the plea is a lesser sentence. . . . In this situation the court may conduct an evidentiary hearing to determine whether the defendant has shown a reasonable probability that but for counsel's errors he would have accepted the plea.

Id. at 1389.

However, to argue that Lafler entitles Mobley to an evidentiary hearing bypasses the requirement that Mobley establish deficient performance. In Lafler, the parties stipulated to this point. Id. at 1384. By contrast, here there is insufficient record to determine whether counsel's performance fell below an objective standard of reasonableness.

Mobley maintains that the court should have considered this issue at the trial level, rather than leave a limited record on appeal. Where a defendant raises ineffective assistance at trial, the proper course may be for the court to conduct further inquiry. See, e.g., United States v. Nguyen, 262 F.3d 998, 1003-05 (9th Cir. 2001). In Nguyen, the defendant repeatedly requested new counsel due to a perceived breakdown in communications. Id. at 1002, 1004. The district court denied his requests, cursorily concluding that his attorney was competent and suggesting that any error could be remedied on appeal. Id. at 1004. The Ninth Circuit reversed, calling these rationales "improper." Id. at 1003, 1005. It explained that the district court should have taken the

time to carefully consider the attorney-client relationship. See id. at 1003. It further stated that, by leaving the ineffective assistance issue for appeal, the district court incorrectly limited the defendant's arguments. Id. at 1004.

The present case is distinct from Nguyen. For example, Mobley did not raise his ineffective assistance claim in a preventative manner. The breakdown in Nguyen was ongoing and affected the defendant's representation for the remainder of the trial and sentencing. See id. at 1002. By contrast, Mobley alleged a past error—not current or continuing ineffectiveness. Further inquiry here was less urgent than in Nguyen.

Moreover, Mobley did not present his ineffective assistance argument in a timely manner or allow the State an adequate opportunity to respond. Mobley's attorney received the State's presentence report on April 19, 2012. The sentencing hearing was set for April 20, but, at Mobley's request, was rescheduled for April 27. Mobley's counsel did not raise ineffective assistance until the hearing, eight days after he received notice of the State's intent to seek to sentence Mobley to consecutive terms. Despite the fact that he had more than a week to prepare, Mobley did not provide the State or the court with briefing or any indication that he intended to allege ineffective assistance.

By concluding the fact-finding portion of the proceedings, the trial court admittedly limited Mobley's ability to demonstrate and argue ineffective assistance on direct appeal. But, as the State notes, when matters outside the trial record must be considered to resolve an issue, the proper course is a personal restraint petition. McFarland, 127 Wn.2d at 335. Such is the case here.

The present record is insufficient to review this issue on direct appeal. We decline to remand for an evidentiary hearing.

## II. *Batson* Challenge

Mobley contends that the trial court improperly denied his Batson objection to the State's peremptory challenge to an African-American juror. Batson v. Kentucky, 476 U.S. 79, 86, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986) The State maintains that the prosecutor had a race-neutral reason for the challenge, because the juror failed to disclose relevant information until after the prosecution's time for voir dire had concluded.

In Batson, the United States Supreme Court held that the Equal Protection Clause prohibits purposeful racial discrimination in the jury selection process. Id. The Court established a three-part process to determine whether a prosecutor improperly excluded a juror based on race. See id. at 96-98. First, the defendant must make a prima facie case of purposeful discrimination.[4] Id. at 96. The burden then shifts to the State to provide a race-neutral explanation for excusing the juror. Id. at 97. Finally, the trial court must determine if the defendant established purposeful discrimination. Id. at 98. This court gives the trial court's determination great deference and will not reverse it unless it is clearly erroneous. State v. Luvene, 127 Wn.2d 690, 699, 903 P.2d 960 (1995). Where there are two permissible views of the evidence, the finder of fact's choice between them cannot be clearly erroneous. Id. at 700.

In Luvene, the defendant argued that the prosecutor excluded one of the two African-American jurors on the basis of race. Id. at 699. The prosecutor offered two race-neutral explanations: the challenged juror's brother had been convicted of an armed robbery and the challenged juror was very vague on the topic of the death penalty. Id. at

---

[4] If, as here, the prosecutor has provided a race-neutral explanation and the trial court has ruled on the question of racial motivation, "the preliminary prima facie case is unnecessary." State v. Luvene, 127 Wn.2d 690, 699, 903 P.2d 960 (1995).

700. Luvene had been convicted of first degree robbery while armed with a deadly weapon. Id. at 694. He was also sentenced to death for committing aggravated first degree murder. Id. at 694-95. The prosecutor felt that the juror was attempting to avoid answering questions about the death penalty. Id. at 700. The trial court agreed and found that the prosecutor clearly had a race-neutral reason for excusing the juror. Id.

On appeal, Luvene noted that the prosecutor did not excuse other jurors who had relatives with criminal histories or ambiguous stances on the death penalty. Id. The State responded that no other juror possessed both traits. Id. The Supreme Court found that the prosecutor's reasons, taken as a whole, supported the trial court's decision, meaning that it was not clearly erroneous. Id. at 700-01.

Here, the prosecutor raised a peremptory challenge to juror 91, one of two African-American jurors on the venire. He offered a race-neutral reasons for his challenge: Juror 91 did not disclose that she had several family members who were prostitutes until the prosecution's voir dire rounds had concluded. The prosecutor stated,

> That is -- it happened after my round, and I gave her the opportunity and she did not respond. I absolutely cannot seat a juror with that type of experience level, where I know no information about how she thinks about it. And for that reason I most definitely will be exercising peremptory.
>
> . . . .
>
> . . . That was my concern, is that I did not have an opportunity then to follow up on what I feel is a pretty extensive lack of information about this person's involvement in a world that is the whole centerpiece of this case.

The trial court pointed out that the prosecutor had asked about the jurors' attitudes toward prostitution and that juror 91 had offered some answers. The prosecutor responded that juror 91 had responded regarding drugs, but he did not feel that he heard

her attitude toward prostitution specifically. The court concluded that there was no race-based reason for excluding juror 91.

As in Luvene, other jurors possessed the characteristic that troubled the prosecutor, but the excluded juror's background was the most concerning. Id. at 700. Juror 91's mother, three cousins, and two aunts had been prostitutes. By contrast, here, the other jurors had a friend, known 40 years earlier but had lost touch; a stepmother; or high school classmates who were prostitutes. In both the present case and in Luvene, the detail that concerned the prosecutor involved a central element of the case: the victims in this case were prostitutes, while the defendant in Luvene committed the same crime as the juror's family member. Id. at 700. And, in both cases, the prosecutor lacked information about the juror's attitude toward a critical facet of the case.

Mobley argues that the prosecutor's race-neutral reasons were insufficient, because the prosecutor did not ask the court for permission to question the juror further. The trial court has discretion to permit further examination of a juror after voir dire has concluded. See State v. Lopez, 67 Wn.2d 185, 187, 406 P.2d 941 (1965). Lack of questioning before dismissing a juror can be evidence of racially motivated dismissal. State v. Hicks, 163 Wn.2d 477, 491, 181 P.3d 831 (2008). In Hicks, the prosecutor dismissed the only remaining African-American juror. Id. Though he gave race-neutral reasons for doing so, he had failed to question the juror about any of those topics. See id. at 484, 491. The appellate court found that this was sufficient for the trial court to find an inference of discrimination. Id. at 492.

Unlike in Hicks, the prosecutor here made several efforts to elicit relevant information from juror 91, but juror 91 did not disclose important details until the

11

prosecution's voir dire had concluded. This court gives a high level of deference to the trial court's ruling on a Batson challenge. Hicks, 163 Wn.2d at 493. Based on the evidence, the prosecutor's reasons for excluding juror 91 support a finding that his motivation was not racial.

The trial court properly denied Mobley's Batson challenge.

III. Expert Testimony

Mobley asserts that the trial court abused its discretion in permitting the State's expert witness to testify about pimp/prostitute vernacular and dynamics. He raises several challenges to the testimony, arguing that it was cumulative, irrelevant, and impermissibly prejudicial.

We review the trial court's evidentiary rulings for an abuse of discretion. State v. Finch, 137 Wn.2d 792, 810, 975 P.2d 967 (1999). Only relevant evidence is admissible. ER 402. Relevant evidence is that having any tendency to prove or disprove a fact that is material to the determination of the action. ER 401. Relevant evidence may be excluded if its prejudicial effect substantially outweighs its probative value. ER 403.

An expert witness with scientific, technical, or other specialized knowledge may testify at trial if that knowledge will assist the trier of fact to understand the evidence or determine a fact in issue. ER 702. The knowledge may assist the trier of fact if it is not misleading and concerns matters beyond the common knowledge of the average juror. State v. Thomas, 123 Wn. App. 771, 778, 98 P.3d 1258 (2004).

Before trial, Mobley moved to exclude the testimony of Sergeant Ryan Long, whom the State sought to call as an expert in prostitution related crimes. He argued that Sergeant Long's testimony was unnecessary, because there would be three fact

witnesses—Mobley's victims—who could testify about pimp/prostitute terminology. The court admitted the testimony under State v. Simon, 64 Wn. App. 948, 8.1 P.2d 139 (1991), reversed in part on other grounds by State v. Simon, 120 Wn.2d 196, 840 P.2d 172 (1992). In Simon, this court found that the testimony of a police detective with extensive experience with prostitution related crimes would be helpful to the jury. Id. at 963-64. The court stated that the average juror would "not likely know of the mores of the pimp/prostitute world." Id. at 964.

At trial, Sergeant Long testified about many aspects of prostitution. These included the structure of the prostitution industry; common vernacular; and the pimp/prostitute relationship and its stages. Sergeant Long likened the evolution of the pimp/prostitute relationship to that of a domestic violence relationship.

The fact witnesses—A.W., J.J., and J.B.—also testified about prostitution terminology. Their testimony further explained how they personally became involved in prostitution and with Mobley. The witnesses also detailed how their relationship with Mobley evolved. In addition, J.J. and J.B. testified in detail about the events that led up to Mobley's arrest, including the incident in the parking lot and the night he kidnapped J.B.

A. Cumulative Evidence

Mobley argues that, in light of the fact witness testimony, Sergeant Long's testimony was cumulative. While Sergeant Long did testify about some of the same terminology as the fact witnesses did, his testimony also provided a general overview of the prostitution industry and its dynamics. The Simon court recognized that this is helpful to the jury. 64 Wn. App. at 964. By contrast, the fact witnesses' testimony involved their

own specific experiences and backgrounds. Sergeant Long's testimony thus offered something that the testimony of the fact witnesses did not. It was not cumulative.

## B. Relevance

Mobley next argues that two pieces of Sergeant Long's testimony were irrelevant. First, he asserts that testimony about the rules between pimps and prostitutes did not apply to Mobley's relationships with the victims. This argument rests on A.W.'s comment to a police officer that Mobley did not make rules or quotas for her. But, A.W. also testified that Mobley had set a daily quota of $500. While this discrepancy may draw A.W.'s credibility into question, it does not mean that no pimp/prostitute rules applied in this case. For example, Sergeant Long testified that "the number one rule is that the pimp gets all the money." A.W.'s testimony corroborates this dynamic in her relationship with Mobley:

[PROSECUTOR:] Did you hold onto [the money] when you made it?

[A.W.:] No.

[PROSECUTOR:] Where did it grow [sic]?

[A.W.:] To the defendant.

[PROSECUTOR:] How much of it – not in terms of a dollar amount, but what percentage?

[A.W.:] All of it.

Second, Mobley contends that Sergeant Long's testimony about pimps "'selling a dream'" to prostitutes was irrelevant, because Mobley's victims had all worked as prostitutes before. But, Sergeant Long's testimony pertained to a new relationship between a particular pimp and prostitute, not only to a prostitute's first experience. Sergeant Long stated,

14

What we find is -- what I found is that when the interaction starts, it begins with this fraudulent romantic encounter, this "I think you are pretty. Let me get your nails done. We'll get your hair done. Why don't you try these clothes on? You don't -- you may not have a very good family life. Let me help you out."

Once that blossoms, the girl is flattered that somebody is paying attention to them because they may not have a very nice home life. Sometimes they do. Sometimes they are just naive.

It moves to this process where it is kind of that honeymoon process. He has made contact with a person who is potentially the next victim, the prostitute to be turned out. It goes through what I call -- what's known in the game as "selling a dream." And that process is you and I, the pimp and the prostitute, are going to have this wonderful life.

The evidence here shows that a similar pattern happened with at least two of Mobley's victims. A.W. testified that she had a rough childhood with drug-addicted parents. When she met Mobley, he "seemed like a really caring, nice person." He told A.W. that he wanted to meet her parents and help her see her brothers. A.W. said she considered Mobley a boyfriend, although she called it "wishful thinking."

J.B. testified to a similar experience. Her parents were drug addicts and her home life was difficult. At first, Mobley "tried to make me feel better. He told me that he saw a lot of potential in me and he didn't think that I was ugly." J.B. also thought that Mobley "was a nice guy. I thought he seemed pretty smart and dressed really nice." She further testified that "I was definitely very attracted to him. I definitely wanted to have a relationship with him." These experiences parallel Sergeant Long's comments. His testimony was not irrelevant.

C. Prejudicial Effect

Mobley finally argues that Sergeant Long's testimony was more prejudicial than probative for two reasons. First, Mobley challenges Sergeant Long's analogy between

15

pimp/prostitute and domestic violence relationships, although "violence was not alleged to be a feature" in his relationships with the victims. Mobley did not object to this testimony at trial. He may not assign error to it now. RAP 2.5(a); State v. Kirkman, 159 Wn.2d 918, 935, 155 P.3d 125 (2007).

Even had Mobley objected, his argument is not supported by the evidence in this case. The evidence shows that he committed many of his crimes either with violence or the threat of it. Moreover, each of the fact witnesses testified about Mobley treating them violently. Rather than mischaracterize Mobley's relationships, Sergeant Long's analogy merely provided the jury with a more familiar example of an emotionally abusive relationship so it could understand the lesser known world of prostitution.

Mobley next asserts that Sergeant Long's testimony was impermissibly prejudicial, because it vouched for the fact witnesses' credibility. But, Sergeant Long made no comments about the credibility of any other witness. His testimony involved only general statements about common terms and dynamics between pimps and prostitutes. And, he testified that he conducted no investigation in this case, had not conversed with any witnesses, and did not know the identities of the victims—the fact witnesses in question.

The trial court did not abuse its discretion in admitting the State's expert testimony.

## IV.    Witness Misconduct

Mobley alleges that a prosecution witness committed misconduct by improperly referencing Mobley's criminal history and previous weapon possession. Mobley contends that this violated his right to a fair trial.

Criminal defendants have the due process right to a fair trial. State v. Davis, 141 Wn.2d 798, 824, 10 P.3d 977 (2000). Generally, the trial court has wide discretion in

determining how to conduct trial and deal with irregularities. State v. Gilcrist, 91 Wn.2d 603, 612, 590 P.2d 809 (1979). The court should grant a mistrial only when the defendant has been "so prejudiced that nothing short of a new trial can insure that [the] defendant will be tried fairly." Id.

Sergeant Richard McMartin was part of the team that arrested Mobley. During direct examination about the arrest, the prosecutor asked Sergeant McMartin, "What's the protocol in a situation like this?" Sergeant McMartin responded,

> Basically, all we needed to do is see him, and then people would try to move in and arrest him without any issues.
>
> Because of known history with him, we expected him to be armed. So we needed enough people to block him in so he couldn't try to escape.

Sergeant McMartin later commented,

> My experience and training is that anybody can be armed at any time, especially in the criminal – with somebody that has so much criminal history. He was known to have weapons from previous history. We even had information . . . .

At this point, the prosecutor stopped the witness and redirected questioning.

Mobley moved for a mistrial, arguing that the witness committed misconduct. The trial court ruled that Sergeant McMartin's testimony was improper, but that it could be cured with an instruction. The court instructed the jury that:

> You heard information in this trial from Sergeant McMartin referencing alleged criminal history of the defendant. That portion of Sergeant McMartin's testimony is stricken and must not be considered by you.

According to Mobley, this instruction was insufficient to cure the resulting prejudice. This is so, he argues, because Sergeant McMartin's comments about weapons and Mobley's criminal history were extraordinarily prejudicial.

If a trial court instructs the jury to disregard improper testimony, this court presumes that the jurors followed that instruction. State v. Weber, 99 Wn.2d 158, 166, 659 P.2d 1102 (1983). Whether a new trial must be granted depends on whether the improper testimony, when viewed against the backdrop of all the evidence, so tainted the entire proceeding as to deny the defendant a fair trial. Id. at 164.

In Weber, the defendant was convicted of felony flight after being pulled over for running a red light. Id. at 159-60. Weber moved for a mistrial based on the arresting officer's statement that Weber "'felt that he was in a lot of trouble for not stopping.'" Id. at 160. The trial court denied Weber's motion, but instructed the jury to disregard the statement. Id. at 160-61. The Washington Supreme Court affirmed, reasoning that there was additional evidence that Weber willfully failed to stop. Id. at 165-66. The court further noted that we presume the jury follows a judge's instruction to disregard an improper remark. Id. at 166.

Here, as in Weber, Sergeant McMartin's testimony was not the only evidence presented to the jury that Mobley had a weapon. Mobley himself testified that he owned a gun, which was under his car seat when he was arrested. Both A.W. and J.B. testified that they had seen Mobley with a gun that looked like the same gun taken into evidence. J.B. further testified that Mobley used the gun in kidnapping her.

There was also additional evidence that Mobley had a criminal history. The parties stipulated that Mobley had previously been convicted of a serious offense, and the court read this stipulation to the jury. Mobley also admitted that he had several pending drug cases, and both he and his mother testified that there were warrants out for his arrest. In

light of the additional corroborating evidence, Mobley was not so prejudiced that the officer's testimony required nothing short of a new trial.

The trial court properly issued a curative instruction. Mobley was not denied the right to a fair trial.

V.    Sufficient Evidence of Commercial Sexual Abuse of a Minor

Mobley argues that there was insufficient evidence to prove that he promoted commercial sexual abuse of a minor. There is sufficient evidence to support a conviction if, when viewed in the light most favorable to the State, the evidence permits a rational trier of fact to find the essential elements of the crime beyond a reasonable doubt. State v. Tilton, 149 Wn.2d 775, 786, 72 P.3d 735 (2003). When an appellant challenges the sufficiency of the evidence, he admits the truth of the State's evidence and all reasonable inferences that may be drawn from it. State v. Salinas, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992).

To sustain a conviction, the jury must unanimously conclude that the defendant committed the crime charged in the information. State v. Whitney, 108 Wn.2d 506, 511, 739 P.2d 1150 (1987). Where a single offense may be committed in more than one way, the jury need not unanimously agree on the means by which the crime was committed, as long as a rational trier of fact could have found each alternative means proved beyond a reasonable doubt. State v. Kitchen, 110 Wn.2d 403, 410, 756 P.2d 105 (1988).

Mobley was charged with promoting commercial sexual abuse of a minor. The "to convict" instruction provided, in pertinent part,

> To convict the defendant of the crime of Promoting Commercial Sexual Abuse of a Minor, as charged in Count I, each of the following elements of the crime must be proved beyond a reasonable doubt:

19

(1) That during the period of time intervening between January 1, 2011 through June 20, 2011, the defendant:

(a) Knowingly advanced the commercial sexual abuse of J.J.; or,

(b) Knowingly profited from a minor engaged in sexual conduct.[5]

Mobley asserts that neither of the alternative means was supported by substantial evidence.

Mobley argues that there was insufficient evidence to demonstrate that he knowingly advanced J.J.'s commercial sex abuse per section (1)(a) of the to convict instruction. The jury instructions defined "advances commercial sexual abuse of a minor" as:

[A] person, acting other than as a minor receiving compensation for personally rendered sexual conduct or as a person engaged in commercial sexual abuse of a minor:

1) causes or aides a person to commit or engage in commercial sexual abuse of a minor, or;

2) procures or solicits customers for commercial sexual abuse of a minor, or;

3) provides persons or premises for the purposes of engaging in commercial sexual abuse of a minor, or;

4) operates or assists in the operation of a house or enterprise for the purpose of engaging in commercial sexual abuse of a minor, or;

---

[5] The to convict instruction differs slightly from the statutory definition of the crime. Compare RCW 9.68A.101(1) ("A person is guilty of promoting commercial sexual abuse of a minor if he or she knowingly advances commercial sexual abuse or a sexually explicit act of a minor or profits from a minor engaged in sexual conduct or a sexually explicit act."). To the extent that the altered wording changes the elements that the State must prove, Mobley argues that the to convict instruction controls. Where otherwise unnecessary elements of a crime are included in the to convict instruction without objection, the State assumes the burden of proving those added elements. State v. Hickman, 135 Wn.2d 97, 102, 954 P.2d 200 (1998). Here, the State must prove the elements as provided in the to convict instruction.

5) engages in any other conduct designed to institute, aid, or facilitate an act or enterprise of commercial sexual abuse of a minor.

Mobley maintains that none of these elements apply, because J.J. considered Boom—not Mobley—to be her pimp. The precise nature of J.J. and Mobley's relationship is unclear. J.J. testified extensively about giving Mobley money. But, she also testified that she still gave Boom money at that time. When asked whether she considered Mobley her pimp, J.J. said, "I don't know. I couldn't say what we was. I didn't really know. I was kind of at a confusing state." Still, she expressed concern that Mobley would beat her if she didn't give him money. And, it was clear from J.J.'s testimony and the context of the situation that her money was coming from her work as a prostitute. Taken in a light most favorable to the State, J.J.'s testimony was sufficient for a rational trier of fact to find that Mobley caused her to engage in commercial sexual abuse.

Mobley further contends that the State failed to show that he knew J.J. was a minor under section (1)(b) of the to convict instruction.[6] J.J. testified that Mobley knew she was 17 when she started giving him money:

[PROSECUTOR:] How old were you when this was going on that you were giving this money to Mr. Mobley?

[J.J.:] I was 17.

[PROSECUTOR:] Did you and Mr. Mobley ever talk about age?

[J.J.:] No. He knew how old I was when I first met him.

[PROSECUTOR:] Before you started giving him money?

_____

[6] The State counters that the "knowingly" component of element (1)(b) extended to the word "profited," but not to the victim's age. However, where a statutory element requires a mens rea of knowledge, we treat the word "knowingly" as modifying both the verbs and the object of the sentence. See, e.g., State v. Zeferino-Lopez, 179 Wn. App. 592, *97, 319 P.3d 94 (2014); State v. Killingsworth, 166 Wn. App. 283, 289, 269 P.3d 1064 (2012).

21

[J.J.:] Yes. I was with Boom.

[PROSECUTOR:] How did he know that?

[J.J.:] Because I think Boom told him my age.

    [DEFENSE COUNSEL]: Now, I object to speculation.

    THE COURT: Overruled.  [Interaction with coughing juror.]

[PROSECUTOR:] Let me ask you this, [J.J.]: Were you present when Boom told him, or is that something that you just heard about?

[J.J.:] I think Boom told me.

[PROSECUTOR:] That he had told him?

[J.J.:] Yeah. And I heard - -

    [DEFENSE COUNSEL]: Objection, hearsay.

    THE COURT: Sustained.

J.J.'s testimony is the only evidence that Mobley knew J.J. was a minor.  Mobley's hearsay objection was sustained as to J.J.'s statement that Boom told her that he told Mobley her age.  But, Mobley did not move to strike that particular statement or any that preceded.  Nor did the trial court instruct the jury to disregard the testimony.  "When an objection is sustained with no further motion to strike the testimony and no further instruction for the jury to disregard the testimony, the testimony remains in the record for the jury's consideration."  State v. Stackhouse, 90 Wn. App. 344, 361, 957 P.2d 218 (1998).  J.J.'s testimony about Mobley's knowledge thus remained part of the record.  Taken in the light most favorable to the State, J.J.'s testimony is sufficient for a rational trier of fact to find that Mobley knew that J.J. was a minor.

22

Substantial evidence supported both of the alternative means provided in the to convict instruction. There was sufficient evidence to prove that Mobley promoted commercial sexual abuse of a minor.

## VI.  Double Jeopardy

Mobley argues that his kidnapping conviction should have merged into his convictions for rape in the first degree. Under the merger doctrine, when one crime can be elevated to a higher degree by proof of a second crime, the second crime shall merge into the first to prevent double jeopardy. State v. Eaton, 82 Wn. App. 723, 730, 919 P.2d 116 (1996), overruled on other grounds by State v. Frohs, 83 Wn. App. 803, 811 n.2, 924 P.2d 384 (1996). The doctrine applies here, because Mobley's kidnapping conviction elevated his rape convictions from second to first degree.

The State concedes error. We accept the State's concession. We reverse Mobley's kidnapping conviction and remand to the trial court for resentencing. See State v. Kier, 164 Wn.2d 798, 814, 194 P.3d 212 (2008).

## VII.  Juvenile Adjudications

Mobley argues that the trial court improperly used his juvenile adjudications to enhance his offender score and sentence. He asserts that this violated his right to a jury trial and right to due process.

The Washington Supreme Court dismissed this argument in State v. Weber, 159 Wn.2d 252, 255, 149 P.3d 646 (2006). It held that juvenile adjudications fall under the "prior conviction" exception established in Apprendi v. New Jersey, 530 U.S. 466, 490, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000) ("Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must

23

be submitted to a jury, and proved beyond a reasonable doubt."). Weber, 159 Wn.2d at 265. Thus, under Weber, juvenile adjudications may properly be included in a defendant's offender score. See id.

Mobley maintains that Weber was wrongly decided. But, Weber is binding precedent and controls here. The trial court did not err in using Mobley's juvenile adjudications to calculate his offender score and sentence.

## VIII. Cumulative Error

Mobley contends that the errors he alleges resulted in cumulative prejudice that requires reversal of his convictions. The accumulation of otherwise nonreversible errors may deny the defendant a fair trial. State v. Coe, 101 Wn.2d 772, 789, 684 P.2d 668 (1984). But, the defendant must establish multiple errors in order to obtain reversal. Mobley fails to show that any errors occurred at his trial, as the only error he demonstrated involved his sentencing. Accordingly, there is no cumulative error.

We cannot conclude on the record before us that Mobley received ineffective assistance of counsel. We do not find merit in Mobley's allegations of trial error or his challenge to the use of juvenile adjudications in his offender score. We reverse Mobley's first degree kidnapping conviction and remand to the trial court for resentencing. We otherwise affirm.

_Appelwick, J._

WE CONCUR:

_____     _____

24